UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-80813-CIV-RYSKAMP/VITUNAC

ARLENE SPILFOGEL,

        Plaintiff,

   v.

FOX BROADCASTING COMPANY,
a Delaware corporation, LANGLEY
PRODUCTIONS, INC., a California
Corporation, and TURNER BROADCASTING
SYSTEM, INC., a Georgia corporation,

        Defendants.

_____/

DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR
SUMMARY JUDGMENT, AND INCORPORATED MEMORANDUM OF LAW

    Defendants Fox Broadcasting Company ("FOX"), Langley Productions, Inc. ("Langley"),

and Turner Broadcasting System, Inc. ("Turner") (collectively, "Defendants") move to dismiss

the Complaint (DE#1) for failure to state a cause of action pursuant to Fed. R. Civ. P. 12 (b)(6).

Alternatively, Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 and 12 (d)

because the Complaint, the declarations filed herewith, and the incorporated memorandum of

law show that there is no genuine issue of material fact and that Defendants are entitled to

judgment as a matter of law.

MEMORANDUM

I.     Introduction

    The nine count Complaint arises from defendant Langley's filming and audio-recording

of Plaintiff on a public street during a traffic stop conducted by Palm Beach County Sheriff's

Deputies, and the subsequent alleged telecasts by FOX and Turner of the film and audio as part

of an episode of the documentary reality television series known as "COPS."  Counts I-VI allege

claims for "invasion of privacy."  Count VII alleges that defendants Langley and FOX violated

Florida's commercial misappropriation statute (§ 540.08, Fla. Stat.) by telecasting the "COPS"

episode and by publishing one or more photographs of the traffic stop on the "COPS" website, www.cops.com.  Counts VIII and IX allege that the Defendants defamed Plaintiff "by implication" because including her in a "COPS" episode implied that she "is a criminal, lawless 'trailer trash' or a scofflaw . . . ."

None of these claims states a cause of action.  The filming, recording, and telecast of a traffic stop does not give rise to an invasion of privacy claim by the person stopped.  There was no wrongful intrusion upon Plaintiff's seclusion because the filming and recording were authorized by law enforcement and occurred on a public street where Plaintiff had no reasonable expectation of privacy.  Nor did the telecast publicize any "private facts" about the Plaintiff, and even if it had publicized such facts, their inclusion in a documentary television program such as "COPS" would not be actionable because the content of the telecast was of legitimate public concern.  Plaintiff has no statutory commercial misappropriation claim because the use of her name, image or likeness was not for a "commercial or advertising purpose" within the meaning of §540.08 and because the use was as part of a bona fide news report or presentation having a current and legitimate public interest.  Finally, Plaintiff has no actionable defamation claim because it is clear from the telecast that Plaintiff was not portrayed as a criminal or otherwise defamed.  Alternatively, Defendants are entitled to summary judgment for the same reasons stated above because the material facts are not in dispute and Defendants are entitled to judgment as a matter of law.

An additional ground for summary judgment on all counts is that, contrary to the allegations in the Complaint, Plaintiff signed and delivered a written "Personal Release" to a Langley employee at the scene of the traffic stop.  The Personal Release "irrevocably" granted to Langley and is assignees the right to use Plaintiff's name, voice and likeness as part of the "COPS" television program, and for any advertising or publicity in connection therewith.  Plaintiff also released Langley and its successors and assignees from any claims, damages, actions, or causes of action arising from the use of the recordings Langley made of the Plaintiff.  The Personal Release forecloses Plaintiff's claims and her failure to disclose it in her Complaint

illustrates the frivolous nature of this action.

Finally, Defendant Turner is entitled to summary judgment on all counts for the additional reasons that it had no involvement in this matter whatsoever and because, contrary to Plaintiff's allegations, Courtroom Television Network, Inc. d/b/a truTV ("truTV"), a subsidiary of Turner, never telecast the particular episode of "COPS" that depicts the Plaintiff.

II.     The Facts as Alleged by Plaintiff, the "COPS" Episode which is
        the Subject of the Complaint, and Certain Additional Material
        Facts which are Not the Subject of any Legitimate Dispute

The facts are as follows:[1]

1.      Defendant Langley "produces the television series COPS." Compl. ¶ 13; see also Langley Decl. ¶ 2 ("Langley owns and produces the popular and highly acclaimed television documentary series, "COPS," which depicts the activities of law enforcement officers as they are doing their jobs").

2.      Defendant FOX "broadcasts the television series COPS on its television network channel called FOX." Compl. ¶ 14; see also Langley Decl. ¶ 2 ("'COPS' is broadcast by [FOX]").

3.      Plaintiff Arlene Spilfogel ("Ms. Spilfogel") was "stopped by a law enforcement officer in Palm Beach County, Florida" on or about September 25, 2005. Compl. ¶ 16; see also Flores Decl. ¶ 3-4 ("Sometime around midnight [Palm Beach County Sheriff's Deputy Dan]

---

[1] Defendants' motion is first and foremost a motion to dismiss, so priority is given here to the allegations of the Complaint.  But since the Complaint omits the "COPS" telecast that is its central subject, Defendants have filed declarations authenticating and providing the Court with copies of "COPS" Episode #1832, both as produced by Langley and as telecast by FOX.  In addition, because this motion is alternatively a motion for summary judgment, the facts are presented in a form intended to comply with S.D. Fla. L.R. 7.5C.  This section thus includes additional facts establishing that Plaintiff signed and delivered a personal release to Langley authorizing and consenting to the use of her name, image, and likeness on "COPS" and releasing any potential claims or causes of action arising there from.  It also includes the fact that, contrary to Plaintiff's allegations, truTV has never telecast the "COPS" episode that depicts the Plaintiff. The declarations filed in support of this motion are the Declarations of Christopher Flores ("Flores Decl. ___"), Bryan Collins ("Langley Decl. ___"), Mark Watson ("FOX Decl. ___") and Nikki Mendes ("Turner Decl. ___").

3

Frend stopped a woman named Arlene Spilfogel near the intersection of Montoya Circle and Palmetto Circle North in Boca Raton after observing her running stop signs").

    4.    Ms. Spilfogel's "encounter with the law enforcement officer was captured on film by a duly authorized agent or representative of Langley." Compl. ¶ 17; see also Flores Decl. ¶ 4 ("I [Christopher Flores] filmed the traffic stop using a shoulder mounted camera and [another Langley employee named Joshua Salas] made a sound recording of the traffic stop").

    5.    After the traffic stop was concluded, Mr. Flores "asked Ms. Spilfogel if she would be willing to sign a 'Personal Release' authorizing Langley to use the film and sound recordings [Flores and Salas] had obtained on the 'COPS' television show." See Flores Decl. ¶¶ 5-6. Plaintiff Spilfogel read and signed the "Personal Release" and returned it to Flores. Id., ¶ 6 ("A true and correct copy of the original Personal Release signed by Ms. Spilfogel is attached hereto as Exhibit 1").

    6.    The Personal Release Plaintiff signed and delivered to Langley

> irrevocably grant[ed] to [defendant Langley, its] successors and assignees, the right to use [Plaintiff's] name, voice and likeness and recordations thereof by means of film, videotape and any other means … as part of the program tentatively entitled "COPS" or any other motion picture, television or other production without limitation … including, without limitation, merchandising and publication, advertising and publicity in connection therewith.

The Personal Release further "release[s]" [defendant Langley and its]

> successors and assignees and all other persons, firms and/or corporations involved in the production, exhibition, sponsorship, advertising or other exploitation of the recordings made hereunder from any claims, damages, actions or causes of action of any kind or nature resulting from any use thereof, any recording or gathering of said information, or the exercise of any right granted herein.

    7.    Langley "produced … an episode of COPS that included scenes from Ms. Spilfogel's September 2005 encounter with the law enforcement officer in Palm Beach County,

Florida." Compl. ¶ 18; see also Langley Decl. ¶ 4 ("Attached as Exhibit 1 is a true and correct copy of "COPS" Episode # 1832, the episode that is the subject of this lawsuit").[2]

8.      FOX "broadcast and caused to be transmitted on Fox television network throughout the United States and other parts of the world an episode of COPS that included scenes from Ms. Spilfogel's September 2005 encounter with the law enforcement officer." Compl. ¶ 21; see also FOX Decl. ¶ 3 ("FOX televised "COPS" Episode #1832 on July 8, 2006 and October 28, 2006").[3]

9.      Although Plaintiff alleges that defendant Turner "rebroadcast and caused to be transmitted on TruTV (f/k/a CourtTV) throughout the United States and other parts of the world the same episode of COPS that included scenes from Ms. Spilfogel's September 2005 encounter with the law enforcement officer," see Compl. ¶ 67, "[a]ccording to the records maintained by truTV in the ordinary course of its business, truTV has never telecast "COPS" Episode #1832…." See Turner Decl. ¶ 4.

10.     Langley published "on the official COPS website <www.cops.com>" one or more still images of COPS Episode # 1832, including scenes from "Spilfogel's 2005 encounter with the law enforcement officer." Compl. ¶ 115.

III.    Procedural Standards

    A.    Motion to Dismiss

A complaint should be dismissed under Rule 12(b)(6) where it fails to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, ___U.S.___, 129 S.Ct. 1937, 1949, ___L.Ed.2d___(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); James

---

[2] For the Court's reference, Plaintiff Spilfogel's traffic stop is the third segment of "COPS" Episode # 1832. See Langley Decl., Ex.1.

[3] For the Court's reference, "COPS" Episode # 1832 begins at approximately 21:03 and Plaintiff Spillfogel's traffic stop begins a approximately 21:23. See Fox Decl., Ex.1.

River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1274 (11th Cir. 2008) (citing Twombly, 550 U.S. at 555-56).  The former rule – that a complaint should be dismissed only if it appears beyond doubt that the plaintiff can prove "no set of facts" which would entitle her to relief – was retired by Twombly.  James River Ins. Co., 540 F.3d at 1274 (describing Twombly as "retiring the often-criticized 'no set of facts' language previously used to describe the motion to dismiss standard").  Under the applicable standard, "[t]o survive dismissal, the complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed." Id. Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 129 S.Ct. at 1949.  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.   Determining whether a complaint states a "plausible" claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950 (citation omitted).  As the United States Supreme Court explained:

> The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Id. at 1949 (quotation marks and internal citations omitted) (quoting Twombly, 550 U.S. at 557). When a court considers the range of possible interpretations of a defendant's alleged conduct, if the "more likely explanations" involve lawful, non-actionable behavior, the court should find that the plaintiff's claim is not plausible. Id. at 1950-51.

Dismissal is also warranted under Rule 12(b)(6) if, assuming the truth of the plaintiff's allegations, there are dispositive legal issues that preclude relief. Neitzke v. Williams, 490 U.S. 319, 326 (1989); Brown v. Crawford County, 960 F.2d 1002, 1009-10 (11th Cir.1992).

In evaluating a motion to dismiss, the Court may consider, in addition to the well-pleaded factual allegations, any external documents "central to" or "referred to" in the complaint and all matters capable of judicial notice. See, e.g., Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225-26

(11th Cir. 2002) (in libel action, entire book published by defendants could be considered on motion to dismiss because plaintiff "referred to it in her complaint and it [wa]s central to her claims"); <u>Fudge v Penthouse International, Ltd.,</u> 840 F.2d 1012 (1st Cir. 1988) (in action alleging libel, invasion of privacy and intentional infliction of emotional distress, district court did not err in considering a copy of the article in question in granting the defendant's motion to dismiss under Rule 12(b)(6) since the article was central to the plaintiffs' complaint); <u>Bickley v. Caremark RX, Inc.,</u> 461 F.3d 1325 (11th Cir. 2006) (District court could consider ERISA plan and pharmacy benefits manager agreement on motion to dismiss beneficiary's ERISA claim, without converting motion to dismiss to motion for summary judgment, inasmuch as both documents were central to beneficiary's claim).  Accordingly, the Court can and should consider the subject episode of "COPS" because it is referenced in and central to Plaintiff's Complaint.[4]

> B.    <u>Summary Judgment</u>

In the event the Court treats this motion as one for summary judgment pursuant to Fed. R. Civ. P.  56 and 12(d), summary judgment is proper if the pleadings, discovery and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 249 (1986).

---

[4] Defendants' position is that the Court can consider on a motion to dismiss the Personal Release signed by Plaintiff because it is absolutely "central to" each of Plaintiff's claims – indeed, it is wholly dispositive of them.  Plaintiff, however, failed to disclose the Personal Release in the Complaint. Accordingly, this motion is also, alternatively, a summary judgment motion. <u>See, e.g.</u>, <u>Dent v. Giaimo</u>, 606 F.Supp.2d 1357 (S.D. Fla. 2009) (Ryskamp, J.) (granting summary judgment on defendant's "motion to dismiss and alternative motion for summary judgment" and recognizing that when "the plaintiff fails to attach a crucial document to the complaint, a defendant may include that document with its motion to dismiss, but [that] the Court's consideration of that document may convert the motion into one for summary judgment").

III.    Argument

      A.    Counts I – VI of the Complaint Fail to State a Cause of Action for Invasion of Privacy by Giving Publicity to Private Facts or for Intrusion Upon Seclusion

Counts I-VI are based upon vague and conclusory allegations that Defendants' "filming, production and broadcast [of Plaintiff's traffic stop] was and still is an intrusion upon Ms. Spilfogel's seclusion…" and that such "filming, production and broadcast publicly disclosed private facts about Ms. Spilfogel's eccentricities .…" See Compl. ¶¶ 23, 24, 38, 39, 54, 55, 70, 71, 86, 87, 102, 103.  It thus appears that Plaintiff is attempting to state a cause of action for two forms of common law invasion of privacy– "giving publicity to private facts," and "intrusion." [5] Counts I-VI fail to state a cause of action, however, for either of these torts.

      1.    Counts I-VI Fail to State a "Private Facts" Claim

The "private facts" tort consists of (1) giving publicity (2) to private facts (3) that are highly offensive to a reasonable person and (4) not of legitimate public concern. See Cape Publications v. Hitchner, 549 So.2d 1374, 1377 (Fla.1989); Heath v. Playboy Enterprises, Inc., 732 F.Supp. 1145, 1148 (S.D. Fla. 1990).

Here, Plaintiff has no actionable "private facts" claim because the traffic stop which she alleges Defendants filmed, recorded and telecast, occurred on a public street where any supposedly "private facts" were visible and audible to any member of the public who happened to be passing by, and because the facts associated with official law enforcement actions, including traffic stops, are clearly matters of legitimate public interest.  Furthermore, it is clear from watching the subject episode of "COPS" that no "highly offensive" "private facts" about the Plaintiff were publicized.

---

[5] "Commercial misappropriation" and "false light" are the other two species of "invasion of privacy" that some courts have recognized.  Florida provides a statutory cause of action pursuant to § 540.08, Fla. Stat., to a person whose name or likeness has been used for a commercial or advertising purpose without their consent, and this is the purported basis for Count VII of the Complaint.  Florida does not recognize the tort of "false light."  See Jews For Jesus, Inc. v. Rapp, 997 So.2d 1098 (Fla. 2008) (Florida does not recognize false light but continues to recognize the tort of "defamation by implication").  Defamation by implication is the purported basis for Counts VIII and IX of the Complaint.

Cape Publications v. Hitchner is controlling.  The issue presented in Hitchner was "whether a newspaper can be held liable under a private-facts tort theory for publishing lawfully obtained, confidential child abuse information in a story on a related child abuse trial." 549 So. 2d at 1375.  The information published by the newspaper in Hitchner was expressly made confidential by statute. Id. at 1376-77.  Notwithstanding that it was a crime (second degree misdemeanor) to disclose confidential child abuse information, the Florida Supreme Court concluded that the newspaper could not be held liable for invasion of privacy because the event was "clearly a matter of legitimate public concern." Id. at 1375-77.  The Florida Supreme Court explained as follows:

> The developing law surrounding the private-facts tort recognizes that the requirement of lack of public concern is a formidable obstacle. In fact, the "newsworthiness" defense has been recognized by commentators as being so broad as to nearly swallow the tort. See, e.g., Zimmerman, Requiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort, 68 Cornell L.Rev. 291 (1983). Florida courts have long recognized the restriction placed upon the general right to privacy by the public's right to know:

> But the right of privacy has its limitations. Society also has its rights. The right of the general public to the dissemination of news and information must be protected and conserved. Freedom of speech and of the press must be protected....
> ***
> "The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest. At some point the public interest in obtaining information becomes dominant over the individual's desire for privacy. It has been said that the truth may be spoken, written, or printed about all matters of a public nature, as well as matters of a private nature in which the public has a legitimate interest."

> Cason v. Baskin, 20 So. 2d 243, 251 (1944) (quoting 41 Am.Jur. 935).

> And further:

> [T]he right of privacy does not forbid the publication of information that is of public benefit, and the right does not exist as to persons and events in which the public has a rightful interest.

> Harms v. Miami Daily News, Inc., 127 So.2d 715, 717 (Fla. 3d DCA 1971).

Id. at 1377-78 (ellipses and brackets in original).  The Hitchner court further based its decision on a series of United States Supreme Court cases – e.g., Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975) (holding that publication of a rape victim's name did not give rise to liability for

invasion of privacy under a private-facts theory), which stand for the proposition that the media

cannot be held liable for accurately reporting governmental events because such liability "runs

counter to society's interest in promoting accurate media coverage of government…:"

> In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government .... Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. ***

549 So. 2d at 1378 (quoting <u>Cox</u>, 420 U.S. at 490-91).

Here, as in <u>Hitchner</u>, the public's interest in receiving information about the actions of

law enforcement officers—in the case of "COPS," a first-hand, un-editorialized account of such

actions—trumps whatever privacy interest Plaintiff claims in her "eccentricities" or any other

facts that were revealed during her public traffic stop.[6]  Also central to the result in <u>Hitchner</u> was

"the fact that the information published by [the newspaper] was lawfully obtained; it was freely

given [to the newspaper] by government officials and thus was legitimately within the public

domain." <u>Id</u>. at 1379.  Likewise, it is clear from both the "COPS" program itself and from the

Flores Declaration that defendant Langley's employees were authorized to ride with the law

enforcement officers and to film their activities, and that they lawfully filmed and recorded

---

[6] As the Second Circuit noted in <u>Caldarola v. County of Westchester</u>, 343 F.3d 570, 576 n.3 (2d Cir. 2003) "videotape can also be used to serve the legitimate government purpose of protecting individuals from police abuse and protecting police from false accusations of abuse, such as installing video equipment on police cruisers to record interactions between police officers and individuals pulled over in traffic stops."  Indeed, as this motion is being written, the local newspapers are covering a story about an alleged police "cover-up" that was captured by a Hollywood, Florida, police officer's dashboard camera after the officer rear-ended a car and then arrested the female driver for drunk driving and cited her with improper lane change. <u>See</u>, <u>e.g.</u>, <u>Officers' 'Stray Cat' Story Report Doctored After Cop Crashes Cruiser</u>, South Florida Sun-Sentinel, July 29, 2009 at 1B.

Plaintiff's traffic stop on a public street.[7]  As such, the facts related to Plaintiff's traffic stop are clearly "within the public domain" and are not actionable on a "private facts" theory. Furthermore, unlike the facts publicized in <u>Hitchner</u>, no statute makes facts concerning traffic stops confidential.  To the contrary, the fact that Palm Beach County Sheriff's Deputies stopped Plaintiff and cited her with "no tag light/no head light" is a matter of public record. <u>See</u>, <u>generally</u>, Art. I, § 24, Fla. Const. (granting to "every person … the right to inspect or copy any public record made or received in connection with the official business of any public body, … of the state …."); § 119.01, Fla. Stat. ("[i]t is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person"); § 119.011(12), Fla. Stat. ("Public records" means *all* records " made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency").

    <u>Heath v. Playboy Enterprises, Inc.</u> is also instructive.  In <u>Heath</u>, Judge Scott of this Court dismissed a "private facts" claim for failure to state a cause of action.  732 F.Supp. at 1148-49. In <u>Heath</u>, the guardian *ad litem* of a minor child sued *Playboy Magazine* for publishing a photograph of the child in connection with an account of a paternity action against the son of *Tonight Show* host Johnny Carson. <u>Id</u>. at 1146.  Judge Scott analyzed the claim as follows:

> Plaintiff does not dispute that the photograph published in *Playboy* was taken in front of the Broward County Courthouse during one of [the mother's] court appearances. A photograph taken in a public place is not private. <u>Oklahoma Publishing Co. v. District Court</u>, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) (photograph of eleven year-old boy taken in connection with juvenile proceeding involving that child and attended by reporters was not private); <u>Cape Publications, Inc. v. Bridges</u>, 423 So.2d 426, 427 (5th DCA 1982), <u>review</u> <u>denied</u>, 431 So.2d 988 (1983), <u>cert</u>. <u>denied</u>, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229

---

[7] Furthermore, recording a traffic stop on a public street where Plaintiff had no reasonable expectation of privacy clearly would have been lawful even if not expressly authorized by law enforcement and even had it been secretly recorded by a hidden camera. <u>See</u>, <u>e.g.</u>, <u>Lucas v. Fox News Network, LLC</u>, 2001 WL 100181, *2 (11th Cir. 2001) (affirming dismissal of private facts and intrusion invasion of privacy claims where defendants "secretly recorded and broadcast" a religious "study session" because "[w]hether or not Fox correctly characterized the [plaintiff's] Church as a 'cult,' its activities on the campus of a state university are undoubtedly matters of public interest, whether the purpose of publishing those activities is to inform or entertain").

(1983) (photograph of woman clutching dish towel to her body to conceal her nudity as she was escorted to police car after kidnapping was "in full public view"); Ault v. Hustler Magazine, 860 F.2d 877, 883 (9th Cir.1988), cert. denied, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989) (when a person agrees to be photographed for a newspaper, the photograph is not a private concern); Jackson v. Playboy Enterprises, Inc., 574 F.Supp. 10, 11 (S.D.Ohio 1983) (photographs of three minor boys and policewoman on city sidewalk in plain view of the public eye were not "purely private activity"); Prosser, Torts, §§ 809, 811. Therefore, the photograph of [the mother] and [child] in the March 1988, *Playboy* issue is not a private fact as a matter of law.

Plaintiff concedes that [the child's] paternity and child support award were disclosed in public judicial records. Facts taken from public records or proceedings are not private. Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (statute held unconstitutional where it prohibited publication of name of rape victim that became known to public through official court records dealing with trial of rapist); Doe v. Sarasota-Bradenton Florida Television Co., Inc., 436 So. 2d 328 (2d DCA 1983) (videotape of rape victim's testimony taken during public trial is not private); Boyles v. Mid-Florida Television Corp., 431 So. 2d 627, 636 (5th DCA 1983), approved, 467 So. 2d 282 (Fla.1985) (upholding television broadcast of facts taken from HRS summary report, classified by statute as public record). Therefore, the account of [the mother's] paternity action and child support award as published in the March 1988, issue of *Playboy* included no private facts as a matter of law.

Id. at 1148-49.  Judge Scott noted that whether the plaintiff consented to the publication is

irrelevant:

[C]onsent is irrelevant to the privileged publication of public facts. Valentine v. C.B.S., Inc., 698 F.2d 430, 433 (11th Cir.1983) (construing Florida law) (plaintiff as involuntary witness to murder need not consent to inclusion in song depicting events); Jacova v. Southern Radio and Television Co., 83 So. 2d 34, 40 (Fla.1955) (innocent bystander photographed at scene of gambling raid has no cause of action as an involuntary participant); Stafford v. Hayes, 327 So. 2d 871, 872 (1st DCA 1976), cert. denied, 336 So. 2d 604 (Fla.1976) (plaintiff photographed in hotel bar after evacuation of state buildings because of bomb threat need not consent to being televised); Restatement (Second) of Torts, § 652D, Comment F (1977). *** "[C]onsent is never reached where no disclosure of private facts can be demonstrated."

Id. at 1150.

Here, no private facts were disclosed because Plaintiff's traffic stop, as in Heath,

occurred in public view on a public street, the fact and the results of the stop are memorialized in

public records, and because a law enforcement traffic stop is the subject of legitimate public interest.  Furthermore, a review of the "COPS" Episode # 1832 demonstrates that nothing "highly offensive" or "private" about the Plaintiff was publicized.  Accordingly, Counts I through VI of the Complaint fail to state a claim for giving publicity to "private facts" and should be dismissed or, alternatively, summary judgment should be entered for the Defendants.

### 2.   Counts I-VI Fail to State a Claim for "Intrusion"

Invasion of privacy by "intrusion" is the intentional trespass or intrusion upon physical solitude, such as by breaking into the plaintiff's home or peeping into her window. See Allstate Insurance Co. v. Ginsberg, 863 So. 2d 156, 162 (Fla. 2003) ("The intrusion to which this refers is into a 'place' in which there is a reasonable expectation of privacy …."); Restatement (Second) of Torts §652(b) (1977) (defining the tort of intrusion as "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another."); Guin v. City of Riviera Beach, 388 So. 2d 604 (Fla. 4th DCA 1980) (Invasion of privacy by intrusion consists of "intrusion upon plaintiff's physical solitude or seclusion, as by invading his home"), quoting, W. Prosser, Torts s 117, P. 807 (4th ed. 1971).

Plaintiff alleges no facts that plausibly suggest that any of the Defendants (much less defendants FOX and TBS, which are not alleged to have been present during the filming of Plaintiff's traffic stop) unlawfully intruded into any "place" where Plaintiff had a "reasonable expectation of privacy."  It is clear from the Complaint and from the subject telecast that Plaintiff's traffic stop was conducted by law enforcement officers carrying out their duties on a public street.  As a matter of law, Plaintiff had no reasonable expectation of privacy that the details of her traffic stop would not be observed by the law enforcement officers who made the stop or by any passersby, and no reasonable expectation that the traffic stop would not be filmed and recorded.[8]  See Comment (c), Restatement (Second) of Torts §652(b) (there is no liability

---

[8] It is common knowledge that security cameras routinely record activities occurring on public streets, in parking lots, in shopping centers, and in any number of other public places.

"for observing [a person] or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye"); Guin, 388 So. 2d at 606 (no cause of action for "intrusion" against police officers because they were lawfully within the private residence and therefore had the right to observe items in plain view and to take appropriate action);[9] Heath, 732 F.Supp. at 1148 n.8 ("To the extent that the intrusion theory requires an analysis of public and private facts or locations, this theory is disposed of by our analysis under the first theory of recovery, the publication of private facts"). Furthermore, Plaintiff's allegation that she did not consent to the filming and recording of her traffic stop is irrelevant because her consent was legally unnecessary.  As such, she has no claim for invasion of privacy by intrusion.

Accordingly, Counts I-VI of the Complaint fail to state a claim for invasion of privacy by "intrusion" and should be dismissed with prejudice or, alternatively, summary judgment should be entered in favor of Defendants on these counts.

B.      Count VII of the Complaint Fails to State a Cause of Action for Commercial Misappropriation Under Section 540.08, Fla. Stat.

Count VII of the Complaint purports to state a claim against defendants Langley and FOX for an alleged violation of § 540.08, Fla. Stat.  Plaintiff alleges that "one or more photographs of [her] encounter with the law enforcement officer" appeared on the "official COPS website www.cops.com" and further alleges that the publication of the "COPS" episode itself amounted to the "unauthorized publication of her name of likeness."  See Compl. ¶¶ 113, 115, 120.  Section 540.08 provides, in pertinent part, as follows:

---

[9] Notably, members of the media are generally not vulnerable to intrusion claims even when they accompany law enforcement officers onto private property while the officers are carrying out their official duties. See, e.g., Florida Pub. Co. v. Fletcher, 340 So. 2d 914, 917-18 (Fla. 1976) (plaintiff could not recover for alleged "invasion of privacy and trespass" in connection with a photograph taken by news photographer after fire marshal and police officer invited news media to accompany them on investigation of fire at plaintiff's house because there was an "implied consent by custom and usage" given that it was common practice to permit media to attend such investigations), cert. denied, 431 U.S. 930 (1977).

(1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any <u>commercial or advertising purpose</u> the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by:

(a) Such person;

***

(4) The provisions of this section shall not apply to:

(a) The publication, printing, display, or use of the name or likeness of any person in any newspaper, magazine, book, news broadcast or telecast, or other news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest and where such name or likeness is not used for advertising purposes;

Counts VII fails to state a cause of action for two independent reasons.  First, the decisions which have interpreted § 540.08 have made clear that this statutory remedy does not apply to publications that do not directly promote some product or service <u>other than the expressive work in which the plaintiff appears</u>.  The Florida Supreme Court's decision in <u>Tyne v. Time Warner Entertainment Co.</u>, 901 So. 2d 802, 810 (Fla. 2005), is controlling.  As the court explained, the term "'commercial purpose' as used in section 540.08, Fla. Stat., does not apply to publications, including motion pictures, which do not directly promote a product or service." <u>Id</u>.  The court in <u>Tyne</u> expressed its agreement with the reasoning of <u>Lane v. MRA Holdings, LLC</u>, 242 F.Supp. 2d 1205 (M.D. Fla. 2002), which held that section 540.08 is not violated by the use of a person's name and image in an expressive work sold as a DVD or in advertising and promoting the sale of the DVD in which the person appeared.  <u>Tyne</u>, 901 So. 2d at 808; <u>Lane</u>, 242 F.Supp. 2d at 1212-14.  Rather, to be considered a "commercial purpose," the plaintiff's image must be used to promote <u>another</u> product or something else other than the expressive work in which the plaintiff appeared. <u>Tyne</u>, 901 So. 2d at 808 ("…the purpose of section 540.08 is to prevent the use of a person's name or likeness to directly promote a product or service because of the way that the use associates the person's name or personality with something else");[10] <u>see also Valentine v. C.B.S., Inc.</u>, 698 F.2d 430 (11th Cir. 1983) (Plaintiff failed to state a cause of

---

[10] <u>Tyne</u> observed that to construe § 540.08, Fla. Stat., otherwise would violate the First Amendment. <u>Id</u>. at 809.

15

action under § 540.08 where writers and publishers of a song depicting a real-life murder trial and mentioning plaintiff's name did not use plaintiff's name to directly promote another product or service).

Here, Plaintiff does not allege, nor could she plausibly allege, that Langley or FOX used her name and likeness to promote another product or service (e.g., a brand of shoes, makeup, or car inspection services). Her name and likeness were used only in the "COPS" episode in which she appeared and in the advertising incidental thereto (i.e. the still image that allegedly appeared on "the official COPS website," www.cops.com to promote the program). See Lane, 242 F.Supp. 2d at 1213-15. As such, Plaintiff has no claim under § 540.08.

The second reason why Count VII fails to state a cause of action is that the use of Plaintiff's image and likeness on "COPS" falls squarely within the statutory exception created by § 540.08(4)(a) for "any…news broadcast or telecast, or other news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest …." because, as discussed above, the activities of law enforcement officers engaged in a traffic stop are of clearly of legitimate public interest. Defendant's alleged publications are therefore non actionable.

Accordingly, Count VII fails to state a cause of action against defendants Langley and FOX and should be dismissed with prejudice or, alternatively, summary judgment should be entered in favor of defendants Langley and FOX on this count.

> C.   Counts VIII and IX of the Complaint Fail to State
> a Cause of Action for Defamation By Implication

Counts VIII and IX purport to state claims against the Defendants for "Defamation by Implication." Notably, Plaintiff does not allege, nor could she plausibly allege, that the Defendants, or any of them, actually uttered any false and defamatory statements about her. This is easily confirmed by viewing "COPS" Episode # 1832, which is merely a film and audio recording of Plaintiff's traffic stop without any editorial commentary by Langley or the other defendants.

16

Plaintiff alleges, however, that the "filming, production and broadcast of the segment showing Ms. Spilfogel on COPS suggests to the public that Ms. Spilfogel is a criminal, lawless 'trailer trash' or a scofflaw and not a reputable member of society." Compl. ¶¶ 135, 151. Plaintiff explains that "the television series COPS typically shows alleged criminals, lawless 'trailer trash' and scofflaws, as they commit crimes or misdemeanors, many of them violent in nature, or engage in vulgarities or antisocial behaviors, or while they are confronted and arrested by law enforcement officers." Compl. ¶¶ 133, 149. Thus, Plaintiff's theory seems to be that her mere appearance on "COPS" defamed her by "suggest[ing] to the public" that she is a criminal.

Defamation has the following five elements: (1) publication; (2) falsity; (3) fault; (4) actual damages; and (5) the statement must be defamatory. Jews for Jesus, Inc., 997 So. 2d at 1106. Defamation by implication can arise where the accused publication is literally true, but it nonetheless conveys a false and defamatory meaning to the ordinary reader. Id; see, e.g., Brown v. Tallahassee Democrat, Inc., 440 So.2d 588 (Fla. 1st DCA 1983) (reversing dismissal of defamation complaint where defendant published plaintiff's photograph in a story about a murder in which the plaintiff was not involved, but the juxtaposition of the photograph and the text implied his association with the murder).

Whether a publication is reasonably capable of conveying a defamatory meaning to the ordinary reader or viewer is an issue of law that the trial court can adjudicate on a motion to dismiss. See Byrd v. Hustler Magazine, Inc., 433 So. 2d 593, 595 (Fla. 4th DCA 1983) ("Where the court finds that a communication could not possibly have a defamatory effect … the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage"); Kurtell & Company v. Miami Tribune, Inc., 193 So. 2d 471 (Fla. 3d DCA 1967) (affirming dismissal of libel action where the trial judge correctly determined from the article attached to the complaint that the plaintiff's assertion that he was defamed was not supported by the article); McCormick v. The Miami Herald Publishing Co., 139 So. 2d 197, 200-01 (Fla. 2d DCA 1962) (affirming dismissal with prejudice of libel action where the trial court determined the subject news report was neither false nor defamatory).

As explained in <u>Bryd</u>, to determine whether a publication is defamatory, the publication must be considered in its entirety. 433 So. 2d at 595 ("the court must consider all the words used, not merely a particular phrase or sentence"); <u>see also</u>, <u>Morse v. Ripken</u>, 707 So. 2d 921, 922 (Fla. 4th DCA 1998) (affirming dismissal of complaint for failure to state a cause of action based on court's consideration of all of the words used and the context of the publication); <u>Friedgood v. Peters Publishing Co.</u>, 521 So. 2d 236, 242 (Fla. 4th DCA) ("The allegedly defamatory words must be read in the context of the entire publication, and if the documents could not possibly have a defamatory effect the complaint may be dismissed ….") <u>rev</u>. <u>denied</u>, 531 So. 2d 1353 (Fla. 1988), <u>cert</u>. <u>denied</u>, 488 U.S. 1042 (1989).

Applying these principles, it is clear as a matter of law that "COPS" Episode # 1832 does not remotely "suggest[]" that Plaintiff is "a criminal, lawless 'trailer trash' or a scofflaw and not a reputable member of society." At the very outset of the segment in which Plaintiff appears, which is plainly unrelated to the other two segments included in the episode, Deputy Frend describes how he treats people in "District 7" (Boca Raton) differently than other Districts because "…sometimes you're dealing with people who aren't truly criminals…."[11] As the segment progresses, Plaintiff Spilfogel can be seen running a stop sign and driving with an unlit tag light, which result in her being pulled over by Sheriff's deputies and questioned. At the conclusion of the segment, Plaintiff is ticketed for "no tag light/no head light," a non-criminal traffic infraction. Nowhere in the segment is Plaintiff depicted as a criminal, or as trailer trash[12] or a scofflaw, and no ordinary person viewing "COPS" Episode # 1832 would reasonably

---

[11] Like all episodes of "COPS," the Episode # 1832 begins with the disclaimer, "COPS is filmed on location with the men and women of law enforcement. All suspects are innocent until proven guilty in a court of law."

[12] The term "trailer trash," which appears in the Complaint, but not in "COPS" Episode # 1832, is perhaps more defamatory of the person using this pejorative than any person who actually lives in a manufactured home. In any event, assuming *arguendo* that "COPS" Episode # 1832 had actually referred to the Plaintiff as "trailer trash," such an epithet would have amounted to mere "name calling" and would not be actionable defamation. <u>See</u> <u>DeMoya v. Walsh</u>, 441 So. 2d 1120 (Fla. 3d DCA 1983) (calling plaintiff a "raving idiot" was not actionable). A statement that would not be actionable if made expressly certainly cannot be actionable if it is implied.

understand the telecast as having impliedly attributed those characteristics to the Plaintiff.

Furthermore, an ordinary person viewing "COPS" Episode # 1832 would understand that the segment concerning the Plaintiff was unrelated to the other segments in that episode and would further understand that the segment was conveying nothing more than exactly what happened during Plaintiff's traffic stop.  See, e.g., Lane, 242 F. Supp. 2d at 1221-22 (applying Florida law, company that edited and assembled video footage depicting young women exposing themselves in public places was not liable for false light invasion of privacy [now treated in Florida as the tort of defamation by implication] to underage girl who was depicted in video exposing her breasts on public street, inasmuch as girl's conduct was depicted truthfully and accurately, publication of girl's image in video containing other women engaging in similar acts was neither unreasonable nor inaccurate, and although video was marketed together with another video containing more sexually explicit conduct, there was no suggestion, implication, or innuendo connecting girl with the scenes depicted in the other video).

Accordingly, Counts VIII and IX fail to state claims for "defamation by implication" and should be dismissed with prejudice or, alternatively, summary judgment should be entered in favor of Defendants on Counts VIII and IX.

D.    Defendants Are Entitled to Dismissal of the Complaint or,
Alternatively, Summary Judgment Based Upon Plaintiff's
Execution and Delivery of a Release to Langley

Plaintiff alleges repeatedly in her Complaint that she did not consent to the filming, recording, and telecast of the traffic stop, but these representations are patently false.  The truth is that Plaintiff signed and delivered a written "Personal Release" to Langley cameraman Christopher Flores at the scene of the traffic stop. See Facts, ¶¶ 5,6.  The "Personal Release" granted to Langley and its assignees the right to use the video and sound recordings of the traffic stop on "COPS," and released them from all claims and causes of action arising there from.

The fact of the Personal Release renders this action completely frivolous. See Psenicska v. Twentieth Century Fox Film Corp., 2008 WL 4185752 (S.D.N.Y. 2008) (dismissing three

consolidated lawsuits against the producers of the film *Borat* because the plaintiffs had consented generally to appearing in a "documentary-style movie" by signing and delivering releases to the filmmakers, notwithstanding that they disliked the way they were portrayed in the film and felt duped); see also John Doe I, et al. v. One America Productions, Inc, et al, Case No. SC091723 (Cal. Super. Ct. February 15, 2007) (awarding Fox attorney's fees where plaintiffs sued over *Borat* film notwithstanding that each had signed a release) (available at http://www.onpointnews.com/docs/borat6.pdf ).

Accordingly, the entire Complaint should be dismissed or, alternatively, summary judgment should be entered for Defendants based upon Plaintiff's execution and delivery of the Personal Release.[13]

E.    Defendant TBS is Entitled to Summary Judgment Because it Did Not Telecast "COPS" Episode # 1832 on its truTV Television Network as Plaintiff Alleges

Alternatively, defendant TBS is entitled to summary judgment for the additional and independent reasons that it had no direct involvement in this matter and because its subsidiary truTV did not telecast "COPS" Episode # 1832 on its programming service as Plaintiff has alleged. See Facts, ¶ 9.

Conclusion

For the reasons stated, the Complaint should be dismissed with prejudice or, in the alternative, summary judgment should be granted for the Defendants.

---

[13] The delivery of a release would not ordinarily foreclose a claim based upon a subsequent defamation, but the Personal Release delivered by the Plaintiff to Langley does have that effect here because it expressly authorized the use of the film and audio of the traffic stop on "COPS" and because the segment concerning the Plaintiff merely depicts the traffic stop, as she authorized, without any allegedly defamatory statements or commentary by Defendants.

Date:  August 5, 2009

Respectfully Submitted,

REEDER & REEDER P.A.

By s/ L. Martin Reeder, Jr.
    L. Martin Reeder, Jr.
    Florida Bar Member 308684
    martin@reederandreeder.com
    C. Bryce Albu
    Florida Bar Member 657204
    bryce@reeederandreeder.com
    250 South Central Blvd., Suite 200
    Jupiter, FL  33458
    Tel:  (561) 575-9750
    Fax:  (561) 575-9765

*Attorneys for the Defendants*

## CERTIFICATE OF SERVICE

I certify that on August 5, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day via the transmission of Notices of Electronic Filing generated by CM/ECF on the following counsel of record for Plaintiff:

Warren P. Gammill, Esq.
Warren Gammill & Associates, Suite 1050
Courthouse Tower
44 West Flagler Street, Miami, FL 33130

s/ L. Martini Reeder, Jr.
L. Martin Reeder, Jr.